UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | : |
| | : |
| v. | : CASE NO. 23-cr-118 |
| | : |
| BRITISH AMERICAN TOBACCO P.L.C., | : |
| | : |
| and | : |
| | : |
| BRITISH-AMERICAN TOBACCO MARKETING (SINGAPORE) PRIVATE LIMITED, | : |
| | : |
| Defendants. | : |
| | : |

**JOINT MOTION TO WAIVE PRESENTENCE INVESTIGATION REPORT AND PROCEED TO SENTENCING**

The United States of America (the "Government"), by and through its undersigned attorneys, and the defendant, British-American Tobacco Marketing (Singapore) Private Limited ("BATMS") (collectively with the United States of America, the "Parties"), by and through its undersigned attorneys, respectfully file this Joint Motion to Waive the Presentence Investigation Report pursuant to Federal Rule of Criminal Procedure 32(c)(1)(A)(ii), and proceed directly to sentencing.

Federal Rule of Criminal Procedure 32(c)(1)(A)(ii) provides that no pretrial investigation is required if "the court finds that the information in the record enables it to meaningfully exercise its sentencing authority under 18 U.S.C. § 3553, and the court explains its finding on the record." *See also* U.S. Sent'g Guidelines Manual § 6A1.1(a) (U.S. Sent'g Comm'n 2021) (recognizing that a judge has authority to sentence a defendant without a presentence report). The Parties submit that the information contained in the record of this case sufficiently enables this Court to exercise

its sentencing authority under 18 U.S.C. § 3553 without the necessity of the preparation of a Presentence Investigation Report, and such Report would be superfluous in this case.

I.   **Background**

    A.   *Factual Summary of BATMS's Relevant Conduct*

The Information and Statement of Offense set forth the stipulated factual basis for BATMS's plea to conspiring to commit bank fraud, 18 U.S.C. §§ 1344, 1349, and conspiring to violate the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1705.[1]

        1.   **Conspiracy to Commit Bank Fraud**

The Information alleges that, between in or around August 2007 until in or around June 2017, BATMS conspired with others known and unknown to commit bank fraud and to violate IEEPA through sales of tobacco products to the Democratic People's Republic of Korea ("DPRK" or "North Korea"). Specifically, BATMS was aware that: (i) U.S. financial institutions, including U.S. banks, would not process U.S. dollar correspondent banking transactions on behalf of customers located in North Korea to the extent that such transactions violated sanctions placed on North Korea by the United Nations and the United States and (ii) U.S. sanctions prohibited transactions with sanctioned banks and entities that used U.S. dollar wire transfers and U.S. financial institutions.

In 2001, BATMS and North Korean Tobacco Company ("NKTC") established Joint Venture Tobacco Factory ("JVTF") to manufacture BAT cigarettes in the DPRK for domestic sale and consumption. On April 12, 2005, BATMS entered into a "Sale and Purchase Agreement" with a Singapore-based co-conspirator ("Company 1") wherein Company 1 would buy goods from

---

[1] The Statement of Offense is attached as Attachment A to the deferred prosecution agreement entered into between the Government and British American Tobacco p.l.c., BATMS's indirect parent company.

BATMS and would resell those goods strictly to the entities that BATMS designated in the agreement. The contract stated that Company 1 would pay for the goods once they were received by Company 1, however, another part of the contract stated "BATMS shall deliver the Goods to the location designated by BATMS in DPRK." This agreement was the first of many between BATMS and Company 1.

BATMS maintained control of all relevant aspects of the North Korean business. British American Tobacco p.l.c. ("BAT"), BATMS's indirect parent company, ultimately issued a press release in June 2007 announcing an agreement in principle to sell its shares in the JVTF to Company 1, described as a friendly third party, for one Euro, with another BAT subsidiary retaining the right to repurchase the sold shares in the JVTF after a two-year period, if so desired. Despite the fact that Company 1 and NKTC owned the JVTF, BATMS continued to exercise significant influence over the JVTF and to directly benefit from sales of products to North Korea. Similarly, BATMS continued to exercise significant influence over the North Korea sales.

BATMS structured its transactions with the JVTF in order to obfuscate its sales to North Korea, and therefore caused U.S. financial institutions, including the U.S. banks, to process correspondent U.S. dollar transactions for BATMS's benefit. Had those financial institutions known the transactions originated in North Korea, they would not have processed those transfers.

2.  **Conspiracy to Violate IEEPA**

BATMS likewise was aware that Company 1 used both Korea Kwangson Banking Corp. ("KKBC") and Foreign Trade Bank ("FTB"), two banks that would eventually be designated by the Treasury Department, to transact business.

BATMS had knowledge that Company 1 used KKBC to transact business, even after KKBC was designated by the Treasury Department. For example, on April 29, 2014, in-house

counsel, who was employed by a BAT subsidiary in Asia, sent a list of questions related to sanctions by email to Company 1 employees and an attorney representing Company 1. One of the attachments to the email was a list of all sanctioned North Korean banks, including KKBC and FTB. On July 3, 2014, the attorney representing Company 1 answered the several questions put forward by the in-house counsel. Included in the email was a statement that added "[NKTC] uses the bank known as Korea Kwangson Bank [KKBC]," which at that point had been sanctioned by the Treasury Department for nearly five years. U.S.-dollar wire transfers from NKTC to Company 1 from the time that KKBC was designated on August 11, 2009 until May 2017, when BAT terminated its interest in the North Korean business, totaled approximately $286,810,910. A portion of these funds was transferred to BATMS until August 2016, by which time BATMS had stopped selling products to the DPRK via Company 1.

Similarly, BATMS had knowledge that Company 1 used FTB to transact business. Between 2005 and approximately November 2017, NKTC moved approximately $74,420,000 in bulk U.S. dollar cash to Company 1 using FTB, which was subsequently deposited into Company 1's bank account. A portion of such funds was transferred to BATMS by Company 1 in U.S. dollars and, beginning in June 2014, in Singaporean dollars. These transfers to BATMS stopped in August 2016, however, a month after BATMS had stopped selling products to the DPRK via Company 1. Contemporaneous documents evince BATMS's knowledge of the presence of FTB in the payment chain. For example, a 2009 presentation on BAT letterhead showed the flow of funds between BATMS, the JVTF, Company 1, and North Korea, and included notations to FTB. Further, after FTB was sanctioned on March 11, 2013, NKTC continued to use FTB to send remittances to Company 1 until approximately 2017. A portion of such remittances was transferred from Company 1 to BATMS until August 2016, by which time BATMS had

ceased selling products to the DPRK via Company 1. In or about May 2014, employees from BATMS and Company 1 discussed complying with sanctions, and decided that Company 1 would now pay BATMS in Singapore dollars ("SGD"), as opposed to U.S. dollars. On or about May 5, 2014, BATMS opened an "SGD account" with its bank and asked Company 1 to change the payments to SGD. Prior to BATMS taking steps to open an "SGD account" (*i.e.*, between March 11, 2013, and May 5, 2014), BATMS caused U.S. financial institutions to process approximately $56,788,034 of transactions from North Korea via NKTC's bank, FTB, all of which were ultimately for the benefit of North Korea.

  B. ***BATMS's Criminal History***

The parties agree that BATMS has no criminal history.

  C. ***BATMS's Cooperation and Remediation***

The parties agree that BATMS cooperated extensively with the Government's investigation. BATMS's cooperation included an extensive internal review of BATMS's conduct and synthesis for the Government of voluminous documents and information. BATMS's cooperation revealed for the Government numerous facts regarding the conduct at issue of which the Government was previously unaware. As part of the plea agreement, BATMS has agreed to continue cooperating with the Government for a term of three years.

BATMS has also undertaken remediation efforts and has agreed to continue to enhance its U.S. sanctions and anti-money laundering compliance program. BATMS voluntarily terminated its North Korean business in 2017, prior to any investigation by the Government. Concurrently, BAT, BATMS's indirect parent company, initiated an extensive enhancement of its global compliance function—including its sanctions compliance program. This initiative focused on strengthening and driving a globally consistent approach to compliance across BAT and its

subsidiaries, including BATMS. These enhancements included improved policies, procedures and training regarding sanctions compliance and related laws. For example, these enhancements included the creation of the Business Conduct & Compliance Department ("BC&C"), a global-level compliance department that manages BAT's sanctions compliance program, among other compliance programs, and oversees extensive controls regarding sanctions compliance across multiple jurisdictions. Similarly, BAT's Standards of Business Conduct, which were likewise revamped in 2017 and have since been updated annually, emphasize the importance of sanctions compliance and include global sanctions compliance policies and procedures covering third-party screening, sanctions risk management, and sanctions compliance expectations for third parties. BATMS's Standards of Business Conduct are substantially similar to BAT's global Standards of Business Conduct, albeit tailored to accommodate for local Singaporean laws.

Further to this end, as part of the plea agreement, BATMS has agreed to continue to implement a compliance and ethics program designed to prevent and detect violations of U.S. laws and regulations related to sanctions, money laundering, and bank fraud throughout its operations, as set out in paragraphs 7(a) and 7(b) of the Plea Agreement.

  D. ***Guidelines Calculation***

    1. **Conspiracy to Commit Bank Fraud**

The Parties agree that a faithful application of the United States Sentencing Guidelines ("U.S.S.G.") to determine the applicable fine range yields the following analysis:

**Offense Level**

| | |
|---|---:|
| Base Offense Level:<br>(U.S.S.G. §§ 2X1.1(a), 2B1.1(a)(1)) | 7 |
| Min. of 12: Outside United States/Sophisticated means<br>(U.S.S.G. § 2B1.1(b)(10)) | |
| Min. of 24: More than $1 million in gross receipts from financial institutions<br>(U.S.S.G. §§ 2B1.1(b)(17)(A), 2B1.1( b)(17)(D)) | |
| Total Offense Level: | <u>24</u> |

**Culpability Score**

| | |
|---|---:|
| Base Score:<br>(U.S.S.G. § 8C2.5(a)) | 5 |
| Plus: Pervasiveness/50 employees/substantial authority personnel<br>(U.S.S.G. § 8C2.5(b)(1)(B)(4)) | +2 |
| Cooperation, Acceptance<br>(U.S.S.G. § 8C2.5(g)(2)) | -2 |
| Total Culpability Score: | <u>5</u> |

**Fine**

| | |
|---|---:|
| Base Fine: Amount of pecuniary gain<br>(U.S.S.G. §§ 8C2.4(a)(2)) | $61,268,508.00 |
| Multipliers<br>(U.S.S.G. § 8C2.6) | 1.0 – 2.0 |
| Total Fine Range<br>(U.S.S.G. § 8C2.7) | $61,268,508.00–$122,537,016.00 |

    2.    **Conspiracy to Violate IEEPA**

There are no applicable Guidelines for conspiring to violate IEEPA. The Parties agree, however, that under 18 U.S.C. § 3571(d), BATMS is liable for penalties and fines related to its conduct in violation of IEEPA of $507,354,837.

E. ***Disposition***

Pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure, the Parties agree that the following represents the appropriate disposition of the case: the imposition of a sentence of criminal forfeiture in the amount $189,541,115 (the "Forfeiture Amount"), a period of three years of corporate probation, a penalty and fine in the amount of $440,350,738 ("the penalty and fine amount"), and a special assessment of $800.  This proposed disposition takes into account the applicability of the Sentencing Guidelines, the nature and circumstances of the offense, the need for the sentence imposed to reflect the seriousness of the offense, and the need for the sentence to promote respect for the law, to provide just punishment for the offense, and to afford adequate deterrence to other criminal conduct, as well as for the sentence imposed to protect the public from further crimes.  *See* 18 U.S.C. § 3553(a)(1).  BATMS and the Government further agree that this is a reasonable and appropriate sentence, which is sufficient, but not greater than necessary, to achieve the purposes of sentencing in light of the factors set forth under 18 U.S.C. §§ 3553(a) and 3572.

BAT, BATMS's indirect parent company, entered into a deferred prosecution agreement (the "DPA") simultaneously with BATMS entering into a plea agreement and is jointly and severally liable for the fine, penalty, and forfeiture amount.  In light of the DPA's requirement that BAT pay a total monetary fine, penalty, and forfeiture of $629,891,853, BAT's payment of such amount to the United States Treasury pursuant to the terms of the DPA will fully satisfy the fine, penalty, and forfeiture amount contemplated to be imposed on BATMS pursuant to the plea agreement.

II.     **The Presentence Report Should Be Waived**

A Presentence Report is not necessary in this case because the record allows for the Court to exercise meaningful sentencing authority under 18 U.S.C. § 3553, and thus the Court should waive the Report requirement.  Fed. R. Crim. P. 32(c)(1)(A)(ii).

*First*, the record is undisputed and the factual submissions of the parties are fulsome.  The Parties both conducted extensive investigations into the conduct here—culminating in the stipulated facts in the Information and Statement of Offense.  *See United States v. Brown,* 557 F.3d 297, 299-301 (6th Cir. 2009) (concluding that it is permissible to sentence without a presentence report in a case involving a Fed. R. Crim. P. 11(c)(1)(C) plea with a stipulated statement of facts). The Parties' twenty-eight page Statement of Offense provides extensive factual background on which the Court can assess the appropriateness of the recommended sentence and the Section 3553(a) factors.  A presentence report would be superfluous. *See, e.g.*, *United States v. Unicredit Bank AG*, Case No. 19-cr-128 (5/17/19 Sentencing Hearing Tr. at 3-6).  Likewise, the Parties have accurately calculated the applicable sentencing maximums and minimums, faithfully assessed what a Guidelines fine would be for the charge of conspiring to commit bank fraud, and calculated a reasonable fine for conspiring to violate IEEPA pursuant to 18 U.S.C. § 3571(d).

*Second*, BATMS has no criminal history.

*Third*, a Presentence Report is unnecessary as the U.S. Probation and Pretrial Services System ("Probation") will not have a role to play in supervising the defendant during the probationary period.  The defendant and its indirect parent company (BAT) are both foreign corporations; BATMS is based in Singapore and BAT is based in the United Kingdom. Paragraphs six and seven of the Plea Agreement detail BATMS's requirements for cooperation and remediation.  BATMS is required to report annually to the Government on the status of its

remediation and implementation of compliance programs during the period of corporate probation imposed by the Court.  Further, BAT, as part of its DPA, is likewise required to report annually to the Government its corporate remediation, which including oversight of its subsidiary, BATMS.  *See* BAT DPA ¶¶ 12-14, Att. C.  The requirements of these agreements will ensure that the Government monitors the remedial steps taken by BATMS and that both parties accurately report the same to the Court.

Relatedly, BAT has also entered into a settlement agreement with the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC").  Paragraphs 12, 13, and Attachment C of the DPA, as well as the OFAC settlement agreement, contain detailed compliance commitments.  Both agreements also include a reporting requirement.  Particularly, the DPA requires that BAT submit specific and detailed accounts annually regarding remediation and implementation of these compliance measures.  The OFAC settlement agreement similarly requires BAT to certify annually to OFAC that it has implemented and will continue to implement the required compliance measures.  Both the report and the certification will encompass the steps that BAT is undertaking to ensure BATMS continues to implement these measures.  Given the corporate compliance requirements agreed to with two different government agencies, Probation should have no role in supervising the defendant during the probationary period.  A Presentence Report would be superfluous for these reasons, as well.

Accordingly, the Parties respectfully submit that presentence investigation should be waived pursuant to Federal Rule of Criminal Procedure 32(c)(1)(A)(ii).  *See Brown*, 557 F.3d at 299 (recognizing that "where the judge already has those facts [relevant to sentencing] in front of him, a presentence report is unnecessary").  Further, the parties respectfully request that the Court

proceed to sentenced immediately, should it accept BATMS's plea under Fed. R. Crim. P. 11(c)(1)(C).

Respectfully submitted,

FOR THE UNITED STATES:

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

By: /s/ *Karen Seifert*
Karen P. Seifert (N.Y. Bar No. 4742342)
Assistant United States Attorney

MATTHEW G. OLSEN
ASSISTANT ATTORNEY GENERAL
NATIONAL SECURITY DIVISION
U.S. DEPARTMENT OF JUSTICE

By: /s/ *Beaudre Barnes*
Beau Barnes (D.C. Bar No. 1024150)
Trial Attorney
Counterintelligence and Export Control Section

FOR THE DEFENDANT:

CRAVATH, SWAINE & MOORE LLP

By: /s/ *John D. Buretta*
John D. Buretta (D.C. Bar No. 1741802)
Evan Norris (N.Y. Bar No. 4139093)
Megan Y. Lew (N.Y. Bar No. 4885679)